IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs March 3, 2020

**DOYAN ANDERSON v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 15-03854      W. Mark Ward, Judge**

_____

**No. W2019-00871-CCA-R3-PC**

_____

The petitioner, Doyan Anderson, appeals the denial of his post-conviction petition, arguing the post-conviction court erred in finding he received the effective assistance of counsel at trial. After our review of the record, briefs, and applicable law, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and TIMOTHY L. EASTER, JJ., joined.

Shae Atkinson, Memphis, Tennessee, for the appellant, Doyan Anderson.

Herbert H. Slatery III, Attorney General and Reporter; T. Austin Watkins, Assistant Attorney General; Amy Weirich, District Attorney General; and Leslie Byrd, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Facts and Procedural History*

On direct appeal, this Court summarized the facts surrounding the petitioner's convictions for two counts of aggravated assault and one count of domestic assault, as follows:[1]

_____

[1] Due to the length of the trial court testimony, we have only included those facts relevant to the issues raised on post-conviction and before us.

The victim, Melanie Tenort, testified that she had been in a relationship with the [petitioner] for "five and a half years on and off" and that he was the father of her youngest son.

. . .

[On December 3, 2013, Ms. Tenort] filed for an order of protection against the [petitioner]. The order was entered on December 19, 2013, and Ms. Tenort testified that she watched the [petitioner] sign the order. The order enjoined the [petitioner] from abusing Ms. Tenort or her children and ordered that the [petitioner] "stay away from [her] and . . . the children." However, in late December 2013 and early January 2014, the [petitioner] began to contact Ms. Tenort saying that "he was sorry" and that "he wanted . . . to get back together."

The [petitioner] told Ms. Tenort that "he loved [her] and that he [would] never hit [her] again . . . [and that] he wanted to marry [her]." Ms. Tenort testified that she "felt like [the petitioner] really meant it" and that she believed him. Ms. Tenort began "telling everybody [that they were] engaged." Ms. Tenort explained that she loved the [petitioner] and that she "was excited" about marrying him because she "thought that he was going to change." To that end, the [petitioner] moved in with Ms. Tenort in February 2014. Ms. Tenort further explained that she was not working at that time and needed the [petitioner] to help financially with the children.

Ms. Tenort testified that she thought her relationship with the [petitioner] was "[g]reat" until March 21, 2014. After she woke up that morning, the [petitioner] approached Ms. Tenort, "not in a hostile way," in the dining room wanting to talk about a verbal argument they had the night before. The [petitioner] stated that Ms. Tenort had "cursed [him] out" the night before and that Ms. Tenort's oldest son, who was nine years old at the time, agreed with the [petitioner]. Ms. Tenort testified that she was about to apologize to the [petitioner] when he "started punching [her] in [her] face and in [her] lips and in [her] eyes all at once." Ms. Tenort estimated that the [petitioner] punched her "five or six times."

Ms. Tenort tried to push the [petitioner] away, but she could not. The [petitioner] then "start[ed] grabbing [her] by [her] neck" and choking her. The [petitioner] tried to push Ms. Tenort "down to the ground." At that point, Ms. Tenort's oldest son attempted to defend her by hitting the [petitioner], but the [petitioner] "[s]wung back" at the boy. While the

- 2 -

[petitioner] was striking the boy, Ms. Tenort was able to get up, and she demanded that the [petitioner] "look at what [he had done] to [her] face." The [petitioner] started to turn away, and Ms. Tenort "swung back real hard and . . . hit him in his eye and he buckled to the ground" grabbing his face.

The [petitioner] got up and said, "[B]---h, if I can't find my weed, I'm going to kill you." The [petitioner] started towards the bedroom, and Ms. Tenort told him that she thought the marijuana was in the nightstand. At this point, Ms. Tenort noticed her youngest son in the kitchen opening the refrigerator. Ms. Tenort helped the child "get a juice" and closed the refrigerator. Ms. Tenort then saw the [petitioner] coming out of the bedroom. Ms. Tenort made her way back to the dining room and told the [petitioner] that she had "told [him] [he] was going to find [his] weed."

The [petitioner] grabbed Ms. Tenort and pulled out a revolver from "[u]p under his shirt in his pants." Ms. Tenort thought the [petitioner] was going to shoot and kill her. Instead, the [petitioner] hit her with the gun on the left side of her head. Ms. Tenort testified that the [petitioner] then ran away, taking the gun with him, and that she chased after him yelling for "somebody [to] kill him for [her]." Ms. Tenort further testified that she knew the gun belonged to the [petitioner], that he had it "for some months," and that he usually kept it on her "entertainment set."

After the [petitioner] ran away, Ms. Tenort got in the shower and put a towel around her head to stop the bleeding. Ms. Tenort testified that her head felt "like a bowling ball" and that she was worried that she was going to have a seizure. Ms. Tenort further testified that the pain in her face and head continued after she had been treated at the hospital and that she now gets headaches.

On cross-examination, Ms. Tenort admitted that she had a prior conviction for forgery. Ms. Tenort also admitted that the [petitioner] saw her and the children in violation of the order of protection. Ms. Tenort claimed that she only tolerated this to allow the [petitioner] to see his son. Ms. Tenort denied being afraid of the [petitioner]. Ms. Tenort also denied using marijuana the morning of the March 2014 attack. Ms. Tenort also denied telling hospital staff that she was upset with herself for trying to get back together with the [petitioner].

Ms. Tenort denied that she and the [petitioner] were in a relationship on March 21, 2014. Ms. Tenort explained that while she had proposed to

the [petitioner] at the end of February 2014, she and the [petitioner] had "got to arguing a couple days before" the attack and the [petitioner] "left." Ms. Tenort admitted that the [petitioner] had lived in her apartment from the time that they got engaged until "a couple days before" the attack.

MPD Officers John Cantor and Shondra Wicks responded to Ms. Tenort's apartment on March 21, 2014. The officers found the walkway leading to Ms. Tenort's apartment "covered with blood." There was also "[a] lot of blood . . . inside the apartment building," on the apartment door, and on the floor inside the apartment. Ms. Tenort was "bleeding from the head" and had a rag over her head "trying to apply pressure." Officer Wicks noticed "a whole bunch of blood" coming from Ms. Tenort's wound. Officer Cantor described Ms. Tenort as being "[h]ysterical," and Officer Wicks described her as "a little deranged, excited." The [petitioner] was not at the apartment, and the officers did not see any weapons in the apartment. An ambulance was called to take Ms. Tenort to the hospital.

Ms. Tenort was treated at the emergency room of Methodist South Hospital. Ms. Tenort had "a laceration to the scalp on the left side [of her head that was] about four centimeters long." There was swelling around the area of the laceration. Ms. Tenort also had "swelling on the left jaw" along with "swelling and bruising of her nose." A computerized tomography scan revealed that Ms. Tenort "had a fracture of the nasal bridge." Ten staples were used to close the laceration on Ms. Tenort's head. Ms. Tenort stated that she was "dazed," but she did not lose consciousness while she was being treated. Ms. Tenort was given prescriptions for pain killers and antibiotics when she was discharged from the emergency room.

The nurse who cared for Ms. Tenort, Deborah Williams, testified that Ms. Tenort was "upset, worried about her children[,]" and afraid to return to her apartment. None of the medical personnel who treated Ms. Tenort thought she seemed intoxicated while she was at the emergency room. Lashawn Lewis, a "medical social worker" at Methodist South Hospital, recalled that Ms. Tenort was "very distraught and upset" when they spoke and that Ms. Tenort was worried about going back to her apartment. Ms. Lewis also testified that Ms. Tenort was "very remorseful . . . and upset with herself" for getting back together with the [petitioner]. Ms. Lewis recalled that Ms. Tenort told her that she shared an apartment with the [petitioner] and that the fight began with an argument over alcohol and marijuana.

- 4 -

*State v. Doyan Anderson*, No. W2015-02405-CCA-R3-CD, 2017 WL 2275808, at *1-3 (Tenn. Crim. App. May 24, 2017), *no perm. app. filed*.

The petitioner filed a timely pro se petition for post-conviction relief on November 21, 2017. Following the appointment of counsel on May 25, 2018, the petitioner filed an amended petition for post-conviction relief in which he argued, in part, trial counsel was ineffective for failing to: withdraw from the petitioner's case; meet with the petitioner as necessary; and test evidence found at the crime scene.

## Motion to Recuse

On January 31, 2019, the petitioner filed a motion for recusal, alleging the post-conviction judge, who also presided over the petitioner's trial, prevented the petitioner from having a fair trial, and therefore, should not be allowed to hear his petition for post-conviction petition. Specifically, the petitioner claimed he was prejudiced because his case was transferred to the post-conviction judge's division on the morning of trial; therefore, the post-conviction judge was "largely unfamiliar with the history of the case and the previous motion rulings." The petitioner also argued the post-conviction judge abused his discretion at trial in refusing to allow trial counsel to withdraw from the petitioner's case. Prior to the post-conviction hearing, the post-conviction court heard the petitioner's motion to recuse. The petitioner testified he was prejudiced due to the post-conviction judge's unfamiliarity with the problems between trial counsel and the petitioner. The petitioner believed the post-conviction judge should have investigated "the discrepancies" between trial counsel and the petitioner and allowed the petitioner the opportunity to explain why he believed he needed a new attorney.

The post-conviction court denied the motion to recuse, stating:

[T]he mere fact that I presided over his trial, it didn't go well for him, and he didn't like some of my rulings is not really an adequate ground for recusal.

. . .

If his only allegations are that he was forced to go to trial with a lawyer that he had an adverse relationship with and that I took a transfer of this from another division and, therefore, I wasn't adequately familiar with the case to preside over it as a [j]udge, I don't think either one of those situations raise evidence of any actual prejudice. And this [c]ourt has none. And I don't think it raises an appearance of impropriety.

Based on the proof presented and the above referenced findings, the post-conviction court denied the motion to recuse and proceeded with the post-conviction hearing.

## Post-Conviction Hearing

Trial counsel and the petitioner testified at the post-conviction hearing. Although the petitioner asserted numerous claims in his petition and amended petition, we will summarize only the evidentiary hearing testimony relevant to his claims on appeal.

Trial counsel testified he was appointed to represent the petitioner in March of 2015, prior to the petitioner's arraignment. Trial counsel met with the petitioner three times at the jail, with each visit lasting at least one hour. During these visits, trial counsel and the petitioner discussed trial strategy, witnesses, and the possible sentence the petitioner was facing. Although trial counsel could not specifically remember going over discovery with the petitioner, he testified it was his usual practice to provide his clients with a copy of all discovery. On cross-examination, trial counsel testified that, in addition to three jail visits, he and the petitioner also discussed the case at each of the petitioner's court dates.

Trial counsel testified his trial strategy was two-fold: 1) trial counsel argued the altercation did not unfold the way the victim alleged, and 2) the victim's injuries were not severe enough to constitute serious bodily injuries. However, trial counsel conceded it was difficult to argue the second point because the victim suffered a fractured nasal bridge. Although the petitioner disputed the nature and extent of the victim's injuries and was adamant the victim was not going to testify against him, trial counsel could not recall the petitioner's mentioning any text messages from the victim which may have supported the petitioner's version of events.

Regarding the blood found at the scene, trial counsel testified he did not have that evidence tested. Additionally, trial counsel did not consult with an expert regarding the victim's injuries but did cross-examine the radiologist who testified at trial. On cross-examination, trial counsel acknowledged, in hindsight, if the petitioner's blood was found at the crime scene, trial counsel could have argued the petitioner acted in self-defense. However, trial counsel did not recall any facts that would have supported that theory. The victim almost lost consciousness due to the severity of her head wound, while the petitioner did not appear to have any visible injuries.

Trial counsel also testified the petitioner filed several complaints against him with the Tennessee Board of Professional Responsibility ("the Board"). Trial counsel believed

- 6 -

the petitioner was frustrated and unhappy once he realized the victim was going to testify at trial. However, because it is "customary" for defense attorneys to receive complaints from clients, trial counsel did not allow the petitioner's complaints to affect his representation. After the complaints were filed, the petitioner asked trial counsel to file a motion to withdraw, which trial counsel filed on the morning of trial. However, the motion to withdraw was denied. Although trial counsel thought it was unusual for the petitioner's case to be transferred to a new division after pre-trial motions were ruled on, trial counsel did not object because he "didn't think there would be a difference to where [the petitioner's] case was heard" because he "thought there was going to be the same result regardless."

On cross-examination, trial counsel acknowledged that it was not unusual for a defendant to file a complaint against a defense attorney, especially a public defender. Although trial counsel thought the petitioner was "a fairly articulate person," trial counsel was concerned the petitioner was making poor decisions based on his belief that the victim was not going to testify at trial, and, when it became apparent the victim was going to testify, the petitioner's attitude and demeanor worsened. Despite the change in his relationship with the petitioner, trial counsel would not have approached the trial court unless there was an actual conflict of interest or the petitioner had physically threatened trial counsel. Nevertheless, when the petitioner requested trial counsel file a motion to withdraw, he did so on the morning of trial.

The petitioner testified he met with trial counsel three times at the jail, and each visit lasted between fifteen minutes and one hour. However, on the petitioner's court dates, he was unable to discuss his case with trial counsel. Although the petitioner acknowledged he and trial counsel reviewed discovery, the petitioner was unable to discuss several important issues, including conflicting statements by the victim, due to a lack of communication with trial counsel. Additionally, the petitioner wanted trial counsel to interview Dr. Weatherly, a tomographist, regarding the victim's injuries. Specifically, because the petitioner disputed having a gun during the altercation, he believed Dr. Weatherly could prove the victim's injuries were made by a fist instead of a gun. The petitioner also wanted trial counsel to investigate and obtain phone and text message records from Boost Mobile which would prove the victim lied about how her injuries occurred. On cross-examination, the petitioner agreed the alleged text messages did not state that the altercation did not happen but only that the petitioner did not use a gun when hitting the victim.

When the petitioner asked trial counsel what their trial strategy would be, trial counsel informed the petitioner "there [was] no rebuttal" because the petitioner "admitted to being on the scene." The petitioner stated trial counsel should have argued the altercation did not happen the way the victim portrayed, and, while the petitioner

acknowledged trial counsel attempted to argue this position, the petitioner claimed trial counsel did not "[go] about it the proper way." On cross-examination, the petitioner agreed trial counsel argued the petitioner did not have a gun and emphasized the fact that no gun was ever found.

The petitioner also testified he asked trial counsel to test the blood found at the crime scene; however, trial counsel refused to do so. The petitioner contended the victim stabbed him in the hand during the altercation; therefore, some of the blood at the scene would have belonged to the petitioner. The petitioner acknowledged he did not go to the hospital for his injury, claiming his grandmother treated his hand. On cross-examination, the petitioner acknowledged he did not tell the police about his injury and stated the wound had healed at the time of his arrest.

Prior to trial, the petitioner began to suspect trial counsel did not care about his case. When the petitioner approached trial counsel with concerns, trial counsel told the petitioner they did not matter because he was "still going to [be] found guilty if [he went] to trial." Due to trial counsel's lack of concern, the petitioner filed several complaints with the Board. Although the petitioner believed his relationship with trial counsel was redeemable at the time the complaints were filed, trial counsel's attitude soon worsened. The petitioner testified trial counsel should have filed a motion to withdraw at the time the complaints were filed, but instead trial counsel waited until the morning of trial to file the motion. On cross-examination, the petitioner testified he wrote the original trial judge about his problems with trial counsel but did not ask for a new attorney.

After its review of the evidence presented, the post-conviction court denied relief, and this timely appeal followed.

*Analysis*

On appeal, the petitioner asserts trial counsel was ineffective for failing to withdraw, failing to test the blood found at the crime scene, and failing to adequately prepare for trial. Additionally, the petitioner argues the post-conviction court erred in failing to grant the motion for recusal. The State contends the post-conviction court correctly denied the petition and motion for recusal.

## I.    Trial Counsel

The petitioner bears the burden of proving his post-conviction factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). The findings of fact established at a post-conviction evidentiary hearing are conclusive on appeal unless the evidence preponderates against them. *Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn.

1996). This Court will not reweigh or reevaluate evidence of purely factual issues. *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997). However, appellate review of a trial court's application of the law to the facts is *de novo,* with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel presents mixed questions of fact and law. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Thus, this Court reviews the petitioner's post-conviction allegations *de novo,* affording a presumption of correctness only to the post-conviction court's findings of fact. *Id.*; *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceedings. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the standard for determining ineffective assistance of counsel applied in federal cases is also applied in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687. In order for a post-conviction petitioner to succeed, both prongs of the *Strickland* test must be satisfied. *Id.* Thus, courts are not required to even "address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.*; *see also Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (stating that "a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

A petitioner proves a deficiency by showing "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the *Strickland* test is satisfied when the petitioner shows there is a reasonable probability, or "a probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. However, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must

overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

## A.    Failure to Withdraw

The petitioner argues trial counsel was ineffective for failing to withdraw. Specifically, the petitioner contends he was prejudiced by having to choose between going forward with trial counsel or representing himself because trial counsel waited until the morning of trial to file the motion to withdraw. The State contends trial counsel's decision to wait until the day of trial to address withdrawal was neither deficient nor prejudicial. As to this issue, the post-conviction court made the following findings:

> Three months prior to trial, the [p]etitioner started filing bar complaints against [trial] counsel. Clearly, the [p]etitioner was not happy with his court-appointed attorney, but [trial counsel] testified that this did not affect his representation. Assuming for sake of argument that such a "breakdown" took place, [the petitioner] would have to show that this led to some act of "deficient performance" by [trial] counsel that caused "prejudice" to his case. Here, he has shown neither.
>
> . . .
>
> Indigent defendants do not have the right to pick and choose who is going to be assigned to represent them. If all an indigent defendant had to do to force counsel to withdraw and obtain a new attorney was file a bar complaint, the system would be inundated with bar complaints and defendants would have control over when and if they ever went to trial. Whether trial counsel believes that any conflict with his or her client might cause a problem in the representation and whether to pursue a motion to withdraw is a matter for trial counsel to decide and falls within the area of trial strategy. Here, [the petitioner] has not demonstrated that the failure to pursue the motion prior to the day of trial was an act of "deficient performance." Furthermore, [the petitioner] has failed to establish any likelihood whatsoever that, had the motion been made earlier, it would have been granted. Furthermore, [the petitioner] has not shown any "prejudice" to his case as a result of the failure to move to withdraw earlier.

At the post-conviction hearing, trial counsel testified the petitioner filed several complaints with the Board because the petitioner was frustrated and unhappy upon discovering the victim was going to testify at trial. Because trial counsel had received

Board complaints before, he did not allow the petitioner's complaints affect his representation. However, when the petitioner asked trial counsel to address the concerns about their relationship with the trial court, trial counsel filed a motion to withdraw on the morning of trial. The trial court did not allow trial counsel to withdraw, and trial counsel continued to represent the petitioner throughout the trial. On cross-examination, trial counsel clarified that he typically does not request permission to withdraw unless there is an actual conflict of interest or some kind of physical threat. The petitioner testified, as his trial date neared, he felt as if trial counsel did not care about his case. The petitioner attempted to address his concerns with trial counsel but eventually filed several complaints with the Board. After the complaints were filed, trial counsel's attitude worsened, and the petitioner asked him to file a motion to withdraw. On cross-examination, the petitioner testified that he wrote the original trial judge regarding his problems with trial counsel but did not ask for a new attorney.

The right to counsel does not include "the right to appointment of counsel of choice, or to special rapport, confidence, or even a meaningful relationship with appointed counsel. The essential aim of the Sixth Amendment is to guarantee an effective advocate, not counsel preferred by the defendant." *State v. Carruthers*, 35 S.W.3d 516, 546 (Tenn. 2000) (internal citations omitted). Additionally, "trial counsel is not required to withdraw representation merely because a client has filed a complaint against him with the Board [of Professional Responsibility]." *Henry Darnell Talley v. State*, No. M2018-01756-CCA-R3-PC, 2020 WL 584613, at *9 (Tenn. Crim. App. Dec. 10, 2019) (quoting *Doyale Montez Blacksmith v. State*, No. M2017-02323-CCA-R3-PC, 2018 WL 4584126, at *5 (Tenn. Crim. App. Sept. 24, 2018)). In order to amount to ineffective assistance, a conflict of interest which arises from personal difficulties in the attorney-client relationship must rise to the level where the "attorney cannot exercise his or her independent professional judgment free of compromising interests and loyalties." *Id.*

Implicit in the post-conviction court's order denying relief is an accreditation of trial counsel's testimony, and nothing in the record preponderates against the post-conviction court's factual findings. *See Tidwell*, 922 S.W.2d at 500. Trial counsel testified he did not allow the petitioner's complaints to affect his representation, and, although the petitioner asked trial counsel to withdraw from the case following the complaints, trial counsel did not perceive a conflict of interest which would necessitate the filing of a motion to withdraw. *See Walter George Glenn v. State*, No. E2017-02019-CCA-R3-PC, 2018 WL 4697015, at *5 (Tenn. Crim. App. Aug. 28, 2018) ("Absent an actual conflict of interest or a complete roadblock to effective representation, we are unaware of any duty on attorneys to withdraw from representation simply because a client requests withdrawal."), *perm. app. denied* (Tenn. Jan. 16, 2019). Although trial counsel eventually filed a motion to withdraw at the petitioner's request, the motion was

denied. Accordingly, we conclude trial counsel was not deficient for failing to file a motion to withdraw prior to the day of trial.

Furthermore, the petitioner also failed to show he was prejudiced by trial counsel's decision to file the motion to withdraw on the morning of trial. Trial counsel spoke with the trial court on the morning of trial regarding the petitioner's concerns. The trial court allowed the petitioner to testify regarding the motion before denying the petitioner's request for new counsel. Had trial counsel filed a motion to withdraw earlier, the trial court would have held a hearing and conducted the same analysis. The petitioner has failed to show that but for the timing of the filing of the motion the outcome of the hearing would have been different. Thus, the petitioner is not entitled to relief on this issue.

## B.    Failure to Test Evidence

The petitioner argues trial counsel was ineffective for failing to have the blood found at the crime scene tested. Specifically, the petitioner contends the results of the testing would have shown that the petitioner's blood was also present, which would have supported the petitioner's contention that he acted in self-defense after the victim stabbed him in the hand. The State contends the petitioner has failed to establish he was prejudiced by trial counsel's failure to test the evidence. The post-conviction court made the following findings regarding this issue:

> [The petitioner] contends that his trial counsel was ineffective in not testing the blood found at the scene to determine if any of it belonged to the [p]etitioner. [The petitioner] testified that his hand was cut in the fight he had with the victim and this could have been demonstrated by proving his blood was at the scene. Significantly, [the petitioner] made no effort in the post-conviction evidentiary hearing to establish that the blood at the scene had been preserved and was capable of testing. Further, absent a showing that [the petitioner's] blood was, in fact, preserved and at the scene, there can be no showing of any "prejudice."

At the post-conviction hearing, trial counsel testified, in hindsight, if the petitioner's blood was found at the scene, he could have argued the petitioner acted in self-defense. However, trial counsel was not aware of any facts that would have supported this theory. Specifically, trial counsel was never informed by the petitioner that the victim stabbed him. The petitioner testified that he was stabbed in the hand during the altercation with the victim and that most of the blood at the crime scene would have belonged to him. However, the petitioner acknowledged he did not go to the

hospital for treatment or tell the police about his injury, and the wound had healed at the time of his arrest.

As noted above, trial counsel's testimony indicates he did not have the blood tested because he was not aware of any facts that would support the need for testing. The post-conviction court accredited the testimony of trial counsel, and nothing in the record preponderates against the findings of the post-conviction court. *See Tidwell*, 922 S.W.2d at 500. In addition, the fact that a trial strategy or tactic failed or was detrimental to the defense does not, alone, support a claim for ineffective assistance of counsel. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Deference is given to sound tactical decisions made after adequate preparation for the case. *Id.*

Furthermore, although the petitioner argues trial counsel should have had the blood tested, the petitioner failed to present the results of any such testing and, therefore, cannot establish prejudice. *See Black v. State*, 794 S.W.2d 752, 757-58 (Tenn. Crim. App. 1990). The petitioner is not entitled to relief on this issue.

## C. Failure to Adequately Prepare for Trial

The petitioner argues trial counsel was ineffective for failing to adequately prepare for trial, including failing to meet with the petitioner as necessary. The State contends trial counsel adequately met with the petitioner prior to trial. As to this issue, the post-conviction court made the following findings:

> [Trial] counsel could not recall specifically how many times he met with the [petitioner] but he knew he had at least three jail visits with the [p]etitioner and met with him in the courtroom multiple times on various court dates. Obviously, counsel has a duty to consult with his or her client, but there is no magic formula to determine how many meetings are "necessary." Here, [the petitioner] has shown neither "deficient performance" nor "prejudice."

At the post-conviction hearing, trial counsel testified that he met with the petitioner three times at the jail and that each visit lasted at least one hour. Additionally, trial counsel and the petitioner met at each court appearance to discuss the case. Trial counsel stated he and the petitioner discussed trial strategy, witnesses, and the possible sentence the petitioner faced. Although trial counsel could not specifically remember reviewing discovery with the petitioner, he testified it was his usual practice to review discovery and provide a copy to the defendant. Additionally, although trial counsel did not send an investigator to interview Dr. Weatherly about the victim's injuries, trial counsel did cross-examine Dr. Weatherly at trial. The petitioner agreed trial counsel met

with him three times at the jail. However, he testified these visits lasted between fifteen minutes and one hour. The petitioner also stated he was not able to discuss his case with trial counsel during his court appearances. Because the relationship between the petitioner and trial counsel was strained, the petitioner was unable to discuss several issues with trial counsel. Specifically, the petitioner wanted trial counsel to interview Dr. Weatherly regarding the victim's injuries and to subpoena text messages from Boost Mobile. The petitioner testified that certain text messages between him and the victim and Dr. Weatherly's testimony would prove the petitioner hit the victim with his fist and not with a gun.

The post-conviction court accredited the testimony of trial counsel, and nothing in the record preponderates against the findings of the post-conviction court. *See Tidwell*, 922 S.W.2d at 500. Thus, the petitioner has not shown deficient performance on the part of trial counsel. Furthermore, although the petitioner argues trial counsel should have interviewed Dr. Weatherly and subpoenaed the victim's text messages, the petitioner failed to present either Dr. Weatherly or the text messages at the post-conviction hearing and, therefore, cannot establish prejudice. *See Black*, 794 S.W.2d at 757-58. The petitioner is not entitled to relief on this issue.

## II.    Post-Conviction Court's Failure to Grant Motion for Recusal

The petitioner asserts he was denied a full and fair hearing due to the post-conviction judge's refusal to recuse himself. The petitioner further contends he was denied a fair trial due to the trial court's unfamiliarity with the pre-trial record and the insistence that the petitioner move forward with trial counsel despite the numerous Board complaints filed by the petitioner. The State responds that the post-conviction court did not abuse its discretion in denying the motion for recusal.

A trial judge should grant a motion to recuse if the judge "has any doubt as to his ability to preside impartially in a criminal case or whenever his impartiality can reasonable be questioned." *Pannel v. State*, 71 S.W.3d 720, 725 (Tenn. Crim. App. 2001) (citing *State v. Hines*, 919 S.W.2d 573, 578 (Tenn. 1995)). Similarly, recusal is appropriate "when a person of ordinary prudence in the judge's position would find a reasonable basis for questioning the judge's impartiality." *Alley v. State*, 882 S.W.2d 810, 820 (Tenn. Crim. App. 1994). This Court reviews a trial court's denial of a motion to recuse *de novo*. Tenn. R. Sup. Ct. 10B § 2.01.

Initially, we note the petitioner's motion to recuse was procedurally deficient. Tennessee Supreme Court Rule 10B, section 1.01 provides that a party seeking disqualification or recusal of a judge "shall do so by a timely filed written motion," supported by "an affidavit under oath" and alleging with specificity the grounds for the

motion. "'[R]ecusal motions must be filed promptly after the facts forming the basis for the motion become known, and the failure to assert them in a timely manner results in a waiver of a party's right to question a judge's impartiality.'" *State v. Antonio Freeman*, No. M2012-02691-CCA-10B-CD, 2013 WL 160664, at *4 (Tenn. Crim. App. Jan. 15, 2013) (quoting *Duke v. Duke*, 398 S.W.3d 665, 670 (Tenn. Ct. App. 2012)), *no perm. app. filed*. Here, the petitioner's motion was not supported by an affidavit as required by Supreme Court Rule 10B, section 1.01. Additionally, the petitioner did not raise the issue in timely manner. The petitioner waited over fourteen months from the filing of his petition before seeking recusal based on the post-conviction judge's behavior and comments prior to the petitioner's trial. Accordingly, the petitioner's failure to raise this issue in a timely manner constitutes waiver of this issue. *See Stevie Gibson v. State*, No. W2017-01971-CCA-R3-PC, 2019 WL 962898, at * (Tenn. Crim. App. Feb. 26, 2019) (finding the petitioner waived the issue of recusal when there was a twenty-three month delay between the filing of the post-conviction petition and motion to recuse), *no perm. app. filed*; *State v. Jamie Jones*, No. W2016-00491-CCA-R3-CD, 2017 WL 2493686, at *8 (Tenn. Crim. App. June 9, 2017) (concluding that the defendant's delay of fifteen months before seeking recusal on the basis of the trial court's comments at a bond hearing resulted in waiver of the issue), *perm. app. denied* (Tenn. Oct. 6, 2017).

Waiver notwithstanding, we find no evidence of judicial bias. The petitioner alleges he did not receive a fair trial because the post-conviction judge, who also presided over the petitioner's trial, was unfamiliar with the pre-trial record. However, the petitioner has failed to offer any argument or authority to support his position. Furthermore, although the petitioner argues that he informed the post-conviction judge of the Board complaints filed against trial counsel, our review of the record does not support the petitioner's assertion. The complaints are not mentioned in either trial counsel's motion to withdraw or the petitioner's pre-trial testimony regarding his relationship with trial counsel. The petitioner is essentially arguing the post-conviction judge's adverse rulings at trial created judicial bias against the petitioner. However, adverse rulings by a trial court do not, by themselves, establish judicial bias requiring recusal of the trial court. *Alley*, 882 S.W.2d at 821 ("Rulings of a trial judge, even if erroneous, numerous and continuous, do not, without more, justify disqualification."). The petitioner is not entitled to relief on this issue.

### *Conclusion*

Based upon the foregoing authorities and reasoning, we affirm the post-conviction court's judgment denying the petitioner post-conviction relief.

_____
J. ROSS DYER, JUDGE